Docket No. 103933.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DION BANKS, Appellant.

*Opinion filed February 19, 2010.–Modified upon denial of rehearing May 24, 2010.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

Defendant, Dion Banks, was indicted in Cook County in numerous counts of first degree murder in the shooting death of Rose Newburn, attempt (first degree murder), armed robbery, aggravated vehicular hijacking, aggravated kidnapping, aggravated discharge of a firearm, possession of a stolen motor vehicle, and aggravated unlawful restraint. The State elected to try defendant on only five counts of murder and one count of aggravated discharge of a firearm. The jury returned a general verdict of guilty of first degree murder and a verdict of guilty of aggravated discharge of a firearm. Thereafter, the jury found defendant eligible for the death penalty on two statutory grounds and, after considering evidence in aggravation and mitigation,

found no mitigating factor sufficient to preclude the imposition of a death sentence. The circuit court sentenced defendant to death and therefore his appeal was brought directly to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.

On appeal, defendant contends that (1) the State presented inadmissible hearsay that linked defendant to the carjacking of Rose Newburn's Dodge Intrepid; (2) the State mocked defendant during closing argument, compared the strength of its case against defendant to other cases, and claimed that the jury had to believe all of the State's witnesses were lying to acquit defendant; (3) he was tried by a juror with a bias against gang members; (4) the trial court erred when it excused a potential juror who merely would have had difficulty in imposing a death sentence; (5) the death sentence must be vacated because the jury was not instructed on the elements of the felonies in the felony-murder aggravating factor; (6) the State presented irrelevant evidence of privileges received by prison inmates; (7) the State violated defendant's right to confront witnesses when it had a records keeper testify about his prison disciplinary record and had an assistant State's Attorney read to the jury a statement and the grand jury testimony of a witness to the killing that resulted in defendant's prior murder conviction; (8) the trial court erred when it instructed the jury that the defendant should be sentenced to death if no mitigating factor was sufficient to preclude a death sentence, because that prevented the jury from performing its constitutionally required task of measuring the totality of the mitigation against the aggravation; (9) the State improperly argued that defendant should be sentenced to death because he would kill someone if he received life in prison, that the jury should weigh the aggravation against the mitigation, and that defendant displayed no remorse for the murder; (10) the trial court failed to adequately inquire into defendant's statements that his trial lawyers were ineffective; and (11) the Illinois death penalty statute violates due process under *Apprendi v. New Jersey*, because the State is not required to prove beyond a reasonable doubt that aggravating factors outweigh the mitigating factors.

## BACKGROUND

About 3 p.m. on March 24, 2001, Rose Newburn drove her sons, Tyrone, age 5, and Quincy, age 4, to Ford City Mall. Tyrone, who

was 11 years old at the time of trial, testified that he and his younger brother Quincy were sitting in their mother's car, while she was looking through some papers. He saw a man, later identified as defendant, approach the driver's side window with a gun in his hand and heard defendant tell his mother to "get out of the fucking car." When she did not get out, he saw defendant break the driver's side window, unlock and open the door, drag his mother out onto the ground, and shoot her. Tyrone said that after shooting his mother, defendant got into the car and drove off while he and Quincy were still in the car. After a short time, defendant stopped the car and told the children to jump out the window, but then he opened the driver's side door and let the boys out. After getting out of the car, Tyrone said, he saw defendant talking to someone in a black car, and he watched both cars drive off together. Tyrone and his brother hid behind a stop sign until the defendant drove off, and then they ran to the front of the mall where their mother was.

John Southward testified that he was walking in the mall parking lot that afternoon when he heard an argument and saw a man, whom he later identified in a police lineup and in court as the defendant, standing next to the driver's side of a green Dodge Intrepid about 40 or 50 feet ahead of him. He had a clear look at the man's face.

Southward heard defendant say, "bitch, hurry up and get the fuck out of the car," and heard the victim respond, "please just let my kids out." He then heard a shot and ran toward the car. As Southward was running, he observed defendant break the glass of the driver side window with the butt of the gun, reach into the car, unlock the door, open it, and throw the victim to the ground. He saw the defendant drive away in the victim's car and observed another car that had been parked next to the Intrepid drive off after the defendant, but he did not see anyone inside the other car. During his testimony, Southward admitted to multiple previous convictions in the State of North Carolina, as well as having two outstanding warrants from North Carolina.

Joseph Harrison testified that he and his fiancee, Retrenia Smith, were driving home from a shopping trip and while he was stopped at a red light at 79th Street and Talman, he noticed two cars, a green Intrepid and a dark-colored Corolla, "jumping in and out of lanes."

-3-

Harrison explained that defendant, in the Intrepid, pulled up next to him on the driver's side, but the Corolla hit Harrison's car in the rear. Harrison got out to inspect his car and then went to talk to the driver of the Corolla, a woman later identified as codefendant Shakina Feazell. She refused to roll down her window or respond to him. The Intrepid drove off but then backed up. Defendant exchanged profanities with Harrison and defendant told codefendant to "forget about [Harrison] and take off." She put the Corolla in reverse and then drove off, with defendant following. Harrison said he jumped back into his car and started following them east on 79th Street, as his fiancee called the police.

Harrison stated that he stopped for a red light in the far right lane at 79th and Western, the Corolla was next to him in the middle lane, and the Intrepid next to the Corolla in the left-turn lane. He and defendant again exchanged profanities and defendant told the woman in the Corolla to take off when the light changed. As the light changed the Corolla driven by codefendant left first, followed by Harrison, who was followed by defendant. Defendant then pulled up to the left of Harrison's car and yelled at Harrison to "back the fuck off." Harrison's fiancee testified that she saw a gun in defendant's hand. Harrison said he heard two shots, but he did not see defendant fire them. Harrison then made a U-turn, and he and his fiancee called the police while waiting at a gas station. Harrison later positively identified defendant in a police lineup. His fiancee identified someone other than the defendant in the lineup.

Steve Kelly testified that about 5:35 p.m. on March 24, 2001, he was standing outside the field house in Garfield Park when he heard a big crash and a bang. He went to investigate and saw a woman, later identified as codefendant, lying on the ground next to a Corolla car that had run into a parked van with such force that the van was now on its side. Kelly said that as he attended to her, defendant pulled up in a green Intrepid. Defendant asked the woman if she was all right, helped her up, and told Kelly he would take her to the hospital. Kelly said he pointed them in the direction of the nearest hospital. Kelly said he saw defendant and the woman drive north in the green Intrepid on Central Park Avenue.

By this time, the police had begun their investigation of the carjacking and shooting that occurred at Ford City Mall, as well as the

events reported by Harrison and Smith. Detective Jose Cardo, a uniformed officer on patrol, testified that he received a series of flash messages over the police radio. The first message was about a hit and run accident, which included the description of a green Dodge Intrepid, license plate MSV 43, fleeing the scene of the accident. He said immediately following that message was another, informing the officers that the Intrepid had been taken in a carjacking and shooting at Ford City Mall.

Cardo said he was on Ohio Street traveling west when he received the messages, and he immediately observed the green Intrepid proceeding east on Ohio toward him. Cardo closed in on the Intrepid and saw a male driving, with a female in the passenger seat. He activated his emergency equipment and the Intrepid sped off. After a chase lasting a few blocks, the Intrepid failed to make a left turn onto Lake Street and slammed into a Chicago Transit Authority (CTA) elevated-train pillar. Defendant jumped out of the vehicle and ran. Cardo was able to apprehend defendant when defendant fell after a short foot chase. After taking defendant and codefendant into custody, Cardo stated, he observed a revolver on the floor of the driver's side of the Intrepid.

Officer Jackie Frausto testified that she arrived at scene of the crash at the CTA elevated-train pillar and arrested a woman sitting in the passenger seat of a green Dodge Intrepid. She saw a black revolver with a brown handle on the floor of the driver's side of the Intrepid. She identified a photograph of codefendant as the woman she arrested.

Assistant State's Attorney Jennifer Gonzalez testified that, in the early afternoon hours of March 26, 2001, detectives contacted the Cook County State's Attorney's office, felony review unit, and she responded. Gonzales testified she knew defendant had been in custody since March 24, 2001. After introducing herself and explaining who she was, she informed defendant of his *Miranda* rights. Defendant told her he understood his *Miranda* warnings and responded in the affirmative to her question: "Do you want to tell me about what happened at Ford City Mall?" In this interview, defendant said he met codefendant, Shakina Feazell, in a drug and alcohol rehabilitation program; that she got most of their money by shoplifting; that he and Feazell had gone to Ford City planning to steal a car; that he brought

-5-

his revolver with him; that when he saw the Intrepid, he decided that was the car he wanted; that he went up to the Intrepid, but the woman inside would not roll down the window or open the door, so he shot her, got into the car and started to drive off with the woman's children in the backseat; that the children would not stop screaming so he let them out; and that after codefendant wrecked the Corolla they drove to a gas station and codefendant tried to use the victim's credit cards, which would not work. Defendant also told Gonzales he did not want to talk about firing the gun at anyone else; that he was sorry, he wanted to do the right thing, and he would change places with the victim if it were possible.

Forensic Investigator Peter Larcher testified that he recovered blood and broken glass from the Ford City crime scene and from the scene of the Intrepid crash. He also recovered a loaded revolver with three live cartridges and three spent cartridges, and blood samples. Illinois State Police Forensic Scientist Carlee Konig, an expert in forensic biology, stated that the swabs collected from the Intrepid contained human blood. Forensic Scientist Charity Noreuil explained that she tested the swabs of the stains recovered from the Intrepid and found them to contain a mix of blood from defendant and another contributor she could not positively identify, but who definitely was not the victim.

Robert Berk, a trace evidence analyst with the Illinois Forensic Science Center and an expert in the area of trace analysis and gunshot residue (GSR), testified that he received samples from defendant's clothing and performed GSR tests on them. Berk found trace particles on defendant's clothing and found elevated levels of GSR on the samples from defendant's hands, which indicated that he either handled a weapon, discharged a weapon, or was in close proximity to a weapon when it was fired.

Marc Pomerance, a forensic scientist with the Illinois State Police and an expert in the area of firearms and ballistics evidence, testified that he had examined the two bullets recovered from the victim's body and clothing as well as the cartridges found in the revolver taken from the Intrepid. He testified that the two bullets and the empty cartridge cases found in the revolver had been fired from the gun recovered in the Intrepid to the exclusion of all others.

Dr. Edward Donaghue, the chief medical examiner for Cook

County, was qualified as an expert in forensic pathology without objection and testified that he performed an autopsy on Rose Newburn on March 25, 2001. He stated that the cause of death, within a reasonable degree of scientific certainty, was the gunshot wound to the left thigh and that her manner of death was homicide. He noted a hole in the victim's clothing that indicated there had been a second shot.

After the State rested, defendant made a motion for a directed verdict, which was denied. Defendant did not testify or present any evidence on his behalf. The jury returned with verdicts of guilty of first degree murder and aggravated discharge of a firearm.

The case immediately moved on to the death penalty eligibility phase. The State entered all of the evidence from the trial, as well as a birth certificate for defendant showing his birth date as February 25, 1962, and a certified copy of both an indictment and a 1986 conviction for the intentional murder of Alfred Evans. Detective Thomas Kelly testified he was assigned to Gang Crimes in March 1985 and was one of the officers who arrested defendant for the murder of Evans. A stipulation was entered into by the parties that Jane Klewin, if called to testify, would state that she was employed as an assistant State's Attorney in March 1986 and that defendant pleaded guilty to the murder of Evans and to one count of attempted murder for the shooting of Robert Brown. Defendant presented no evidence at the eligibility phase.

The jury found defendant eligible for the death penalty based on two statutory factors: first, that defendant was convicted of murdering two or more persons, and, second, that Rose Newburn was killed during the commission of another felony. The proceedings then moved on to the second phase of the death penalty hearing to determine whether defendant would be sentenced to death or life in prison.

The State called various witnesses in aggravation, including Pamela Tiggins. She testified that on April 5, 1982, she was at the home of her friend Danielle White and heard White arguing with defendant. White screamed for her to come upstairs, where she saw defendant holding White down on a bed. Tiggins asked defendant to stop and went back downstairs, but she did not leave or summon help. White then came downstairs with defendant. Defendant asked Tiggins to remove her clothes. When she declined to do so, he produced an

ice pick, whereupon she took off her clothes and lay on the floor next to White. Defendant then had sexual intercourse with her while holding the ice pick to White's throat. After defendant left, Tiggins went home and told her mother, who called the police and took her to the hospital.

Peter Earl testified that on February 27, 2001, he stopped at a gas station while driving his 1996 Toyota Corolla. As he was filling his tire with air, an individual stole his Corolla. Earl stated that three weeks later, he saw his car near 69th and Western, and it was being driven by a "black male with bushy hair, an Afro," in his "mid-thirties" whom he could not identify. His car was the Corolla wrecked by codefendant in Garfield Park.

The State also called personnel from both the Illinois and the Cook County Department of Corrections to testify regarding various situations involving the defendant during his time in these institutions.

Officer Damewood testified that on May 2, 1988, at Hill Correctional Center, defendant was permitted to leave his grade equivalency diploma (GED) class, but he did not return as required. Damewood wrote a ticket for defendant because of this infraction. On September 30, 1988, defendant repeatedly refused to leave the dining area after being asked to do so. As he approached defendant, defendant stuck his finger near Damewood's face and told him that with a 25-year sentence, he did not need guards telling him what to do. Finally, on October 4, 1988, he searched defendant's cell and found a steel wood screw about 2½ inches long, a wooden dowel rod about 4 inches long, and some National Football League wagering papers. Damewood explained that wood screws can be attached to dowels to make a weapon.

Sergeant Art St. George testified that he worked at Hill Correctional Center and on August 28, 1990, he was in charge of lining inmates up for yard privileges. Defendant and another inmate were late lining up and St. George told them because of this they could not go to the yard. Defendant and the other inmate continued toward the yard but were turned back by other guards. Defendant was very hostile and told St. George he had better not stop him from going to the yard.

Officer Thomas Hart stated he was working at Hill Correctional

Center when he spotted defendant wearing an unauthorized shirt. He informed defendant he would have to remove the shirt. Defendant refused to remove the shirt and told Hart he would have to kick his ass to get the shirt. Hart explained there were other inmates around at the time and they started encouraging defendant not to give up his shirt. Defendant eventually gave the shirt to Hart's supervisor and no one was harmed.

Lieutenant Jason Henton testified that on September 11, 1994, he was working at Big Muddy Correctional Center. While he was overseeing orientation defendant kept walking in and out of the program. He asked defendant for his identification card to write him a ticket. When he did defendant replied, "you better watch yourself around me, I don't give a fuck about you, I'm not a new jack," meaning, new to being incarcerated.

Officer Balmares testified that on May 11, 2005, he was working in the Cook County Department of Corrections, Division 11, Tier AB, where defendant was housed. Defendant told him, "We can step outside so that I can kick your ass with your smart ass mouth." Defendant did not touch Officer Balmares.

Tayna Rambo testified that on August 29, 2001, she was passing out razors to the inmates at the Cook County Department of Corrections. Defendant yelled at her to hurry up and observed she was so slow she "must not be getting any dick." Rambo stated she issued defendant a ticket. Defendant was locked in his cell when he made those remarks.

Sergeant Krauskopf testified that he was assigned at the time of trial to Division 11 of the Cook County Department of Corrections, where defendant was housed. He saw defendant daily or weekly and said that defendant's attitude toward authority figures was "bad" and many times verbally abusive. He thought defendant did this to curry favor with the other inmates and he felt defendant's behavior made the other inmates more hostile as well.

Officer Jack Hamilton testified that on March 20, 1995, he was working at the Western Illinois Correctional Center. Around 11 p.m., he opened the doors to the wings and defendant, who was housed on the "A" wing, ran through to the "C" wing. He had to yell at defendant repeatedly to come off the "C" wing, and when defendant

finally did, he held open the "C" wing door, which was a breach of security. Defendant told him that he "couldn't make him shut that door and to go ahead and write him a ticket."

Officer Bryk testified that on April 10, 2003, he was working at Cook County jail and saw defendant get in a fight with another inmate. Defendant threw three or four punches at the other inmate, who was taken to the dispensary. Defendant claimed the other inmate spit at him through the opening in his cell door.

Tim Zeeck testified on March 4, 1995, he was working at the Western Illinois Correctional Center. He did a strip search of defendant and discovered two $5 bills in his underpants. He said that inmates are not allowed to possess paper currency. He also found a razor blade after searching defendant's cell. Zeeck explained razor blades were generally used to make weapons. Defendant was punished only for possessing currency.

Dolores Drennan testified that she was a nurse who was working at Western Illinois Correctional Center on June 17, 1996. As she was dispensing medication to inmates, defendant got into an argument with a guard, insulted her, called her an obscene name, and told her she could shove the medications up her ass. Defendant told her to write him a ticket, but that the warden would just throw it out. She believed defendant was waiting to receive psychotropic medications.

Stephen Klimek, a Cook County corrections officer, testified that on March 9, 2006, he was working at the Cook County Department of Corrections. He observed an incident between defendant and a female civilian commissary worker. Klimek stated defendant was questioning where his items were and said, "ok bitch, I see how it is" to the civilian worker and then walked out.

Cook County jail officer Christopher Moore stated that on September 22, 2002, he was working in the barber shop of Division 11 in the Cook County jail. He observed defendant get into a fight with another inmate and strike him about a dozen times. Both defendant and the other inmate were taken to the infirmary.

The State also offered testimony from two other employees of the Illinois Department of Corrections (DOC), Glen Jackson, the chief records officer for DOC, and Robert Griffin, the assistant warden at Pontiac Correctional Center. Each testified, over defendant's

objection, regarding privileges offered to an inmate serving a term of natural-life imprisonment. This testimony and its admissibility will be discussed later in this opinion.

Jackson also testified, over defendant's objection, to some of the contents of defendant's DOC master file which involved five incidents of rules violations. This testimony and its admissibility at the sentencing phase will be discussed later in this opinion.

Former Assistant State's Attorney Barry Gross was called by the State to testify over defendant's objection. The State told the court that Mark Carrington, who was dead by the time of trial, was a witness to the murder of Alfred Evans. The State wanted to present Carrington's grand jury testimony about Evans' murder through Assistant State's Attorney Gross. Defendant argued this created a confrontation clause problem. The circuit court ruled that the transcript was sworn testimony, and therefore reliable, particularly since defendant pleaded guilty to the murder. The court also found that the testimony was relevant to the case, but it did not make a finding as to the confrontation clause objection. The testimony of former Assistant State's Attorney Barry Gross and its admissibility at the sentencing phase will be discussed later in this opinion.

Kim Evans, Alfred Evans' brother, testified that in March 1985 his brother was killed after having been shot four times, twice in the back, once in the groin and once in the thumb.

Finally, the State called Quincy Newburn, who testified as to what he remembered about the day his mother was shot. After Quincy read a victim impact statement, which was admitted into evidence, the State rested in aggravation.

Defendant began his case in mitigation with the testimony of his sister, Germaine Kimber. Against the wishes of her mother, she testified regarding their childhood and life with their parents, Gwendolyn and Austin Banks. She and defendant would get "whoopings" with belts and electrical cords that left welts on their bodies, that her father "drank obsessively" and that he had two temperaments–one nice and one "evil." She could tell by the way he shut his car door in the evening if there would be trouble. Her father carried a gun for his job as a tow-truck driver for the Chicago police and would pull it out around the house. One time he drunkenly fired

his weapon over defendant's head. In their house, it was "ok to lie and be dishonest" as long as it was for good; for example, it was acceptable for defendant to bring money home from selling drugs as long as he used the money to pay bills.

Kimber testified there had once been a confrontation between defendant and their father and that defendant was "put out" by their father and went to live somewhere else. She admitted that she knew defendant was a drug addict and that she was also an addict. She had seen defendant use both heroin and cocaine. Defendant would try to get help and would get clean for a while, but never for good.

Rita White worked at Cornell Interventions as a clinical coordinator. Cornell Interventions was one of the drug treatment centers defendant had previously attended. She stated defendant voluntarily admitted himself to the program in November 2000 as a heroin addict. He completed the standard 30-day program and she never found defendant to be violent.

Sylvia Dillard was defendant's case manager at Cornell Interventions. She stated that defendant was compliant and successfully completed their program. She was defendant's primary counselor and she saw him five days a week during both group and individual sessions. She stated that he was never belligerent, violent, or inappropriate toward women and he did not make her feel threatened.

Dr. Robert Smith, a clinical psychologist, testified on behalf of defendant and was qualified as an expert in the field of psychology with a specialty in chemical dependency. He was hired by the Cook County public defender's office to conduct an evaluation of defendant. He had reviewed several documents, including: the State's "Notice of Intent to Seek Death"; statements from codefendant and Shirley Baldwin, a friend of Gwendolyn Banks; summaries of interviews with defendant's friends and family; defendant's school records; all defendant's medical and hospital records; Cornell Interventions records; the judgment of dissolution of marriage for defendant's parents; and defendant's Chicago criminal record. He also met with defendant three times, and interviewed Gwendolyn Banks, Rafaelle and Germaine Banks, Maryann Kimber Davis (defendant's niece), Katherine and Jacqueline Johnson (defendant's aunts), Anthony Robinson, and Rita White.

Dr. Smith testified to several incidents which he felt were significant in defendant's development, including the defendant (who was 15 years old at the time) learning that he was the product of a rape, and that Austin Banks was not his actual father. He also recited an incident that occurred when defendant was 18 months old and was left by his mother in the care of Austin Banks. When defendant's mother returned she discovered Austin had beaten defendant, causing bruises and welts all over the defendant's back. He went on to say that when defendant was too old to be afraid of being beaten, Austin Banks took to threatening him with the gun he carried for his job. Austin Banks would fire his gun in the home when he was angry, and he once shot a relative. Another incident occurred when defendant was in ninth grade and he got into a fight with another student. During this incident, instead of stopping the fight, defendant's parents encouraged him to fight with the student, and defendant's mother slapped the other child across the face.

According to Dr. Smith, defendant's school attendance started to decline when he was 10 years old. Among children in his socioeconomic class defendant's scores ranged from a best of having 57% of the children do better than him, to his worst category, where 90% did better. Smith testified that by seventh grade, between 99% and 61% of the children in his socioeconomic class were doing better than defendant in various categories measured by the test. Dr. Smith stated he did not believe that defendant was mentally retarded, but his scores indicated a low IQ. At the age of 13, his school reported defendant did not have basic skills in math, science, or social studies.

Dr. Smith testified that when defendant learned Austin Banks was not his father, he became depressed and felt a sense of abandonment. Around that same time, Austin Banks' behavior also became more erratic, including an incident where he shot a family member in the home. It was around this time when defendant confronted Austin Banks about his abusive behavior and cheating on defendant's mother. After being confronted, Austin Banks threatened defendant with a gun and kicked him out of the house. At age 17, a year after Austin Banks forced defendant from the family home, defendant dropped out of school and joined a gang.

Dr. Smith also testified about some of defendant's previous infractions with the law. At age 19 defendant was convicted of robbery, and at age 20 he was charged with rape, attempted rape, "agg. violence"

[*sic*], and unlawful restraint. Defendant ended up pleading guilty to unlawful restraint and received three years in prison. In March of 1985 defendant was charged with murder and he pleaded guilty a year later. Defendant was twice charged in 1998 with possessing a controlled substance and in 1999 he was charged with possessing stolen property.

Dr. Smith also testified to defendant's long history of drug and alcohol addiction, and defendant's unsuccessful attempts to seek treatment for his drug and alcohol issues. Defendant underwent treatment for drug and alcohol addiction in 1999, and again in August and November of 2000. He testified that people with drug addictions often have a "co-existing" mental illness and both need to be treated or neither can improve. Dr. Smith stated defendant's underlying mental illnesses were not treated along with his addiction. In his professional opinion, defendant suffered from dysthymia, or long-term depression, a borderline personality disorder, and an addiction to alcohol, heroin, and cocaine. He also commented that codefendant had said the crime was committed to obtain money to purchase drugs and explained he thought the defendants were going through withdrawal the day of the crime. Because Smith felt these disorders were present at the time the offense was committed, he said it was his professional opinion that would have impacted or diminished defendant's ability to conform his conduct to the requirements of the law and would constitute an extreme mental or emotional disturbance.

Anthony Robinson also testified for the defense. He met defendant in 1997 or 1998 after defendant was released from prison upon completion of his previous sentence for murder. Robinson said he tried to be a mentor for defendant and defendant visited his home several times a week and helped around the yard and house. At one point, defendant accompanied Robinson to an alcohol and substance abuse program Robinson had been attending, although defendant later stopped attending. He began seeing defendant with codefendant, of whom he did not approve, and that on March 21 and 22 of 2001, defendant appeared as though he had been using drugs. After defendant was charged with murder he visited defendant in jail. Defendant told Robinson that the shooting of Rose Newburn was an accident and the gun had discharged as he struck the window with it, although defendant had initially told Robinson he had nothing to do with the murder. Robinson also stated that defendant had told him he did not know there were children in the

car and that he was sorry.

Kathryn Jackson, defendant's cousin, spoke primarily of defendant's childhood. She remembered that the family used to joke that their parties did not end until the police arrived. She stated that at one party, Austin Banks shot a burglar, and at another party, he shot a niece. Jackson's testimony confirmed much of what Kimber had stated: that defendant's parents were not good role models and defendant's father beat him.

In contrast to the Department of Corrections employees who testified for the State, defendant had several DOC officers who testified on his behalf. Officer Frederick Kincaid testified that he had been assigned as defendant's tier officer about two to three years prior to trial. He had used defendant as a tier worker, which entitled him to extra privileges. Kincaid also testified that defendant once helped him diffuse a situation that seemed to be escalating into a fight, and that he gave defendant a Bible and had Bible discussions with him. He had also seen defendant give needy inmates certain things, like soap or underwear. Finally, Kincaid stated that defendant had never been a management problem.

Defendant called Cook County Department of Corrections Officer Chevelle Alberts as his final witness in mitigation. She testified that she had known defendant in the jail for several years, that she had previously used him as her worker, and that an inmate with a bad record would not have been chosen as a worker. She believed defendant believed in God and was interested in scripture and spirituality. She believed he was really concerned about moving in another direction.

## ANALYSIS

### 1. Admissible Testimony or Inadmissible Hearsay

Defendant's first point for review is that the State presented inadmissible hearsay evidence to the jury that linked defendant to the carjacking of Rose Newburn's Dodge Intrepid. Detective Cardo testified that he was on his way to a burglary when there was a series of flash messages sent over the radio. When a crime happens and someone flees the scene, a responding officer will give out a flash of either a person fleeing the scene or a vehicle fleeing the scene so that other units in the area can look for this person or vehicle. Cardo's testimony continued as

follows:

> "Q. [Assistant State's Attorney] When you receive[d] that flash message, what information did you receive?
>
> [Defense counsel]: Objection.
>
> THE COURT: Objection overruled. The jury can regard this matter only not for the truth of the matter asserted in it, but only to show what the officer did when he did it next, if anything.
>
> Q. Thank you. What information did you receive?
>
> A. [Officer Cardo] There's flash message initially of a hit-and-run incident, and they gave a description of a green Dodge Intrepid with a plate of Mary, Sam, Victor four, three, and that vehicle had fled the scene of the accident.
>
> Q. That Mary, Sam, Victor, that's 'MSV'?
>
> A. That's correct.
>
> Q. Now did you receive any other flash messages after that?
>
> A. Yes.
>
> Q. What was that?
>
> A. A message was sent that that vehicle was taken in a carjacking and a shooting from Ford City Mall."

Defendant contends that the State sought to establish defendant's identity as the killer by showing a string of offenses in which he was involved beginning with the carjacking and murder. He argues that Cardo should have testified that he received a message to look for a green Dodge Intrepid and that it was not necessary to explain why he was looking for it.

Defendant argues that Cardo's testimony was inadmissible hearsay. Hearsay is an out-of-court statement offered to establish the truth of the matter asserted (*People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002); *People v. Rogers*, 81 Ill. 2d 571, 577 (1980)) and testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay (*People v. Simms*, 143 Ill. 2d 154, 173 (1991) (and cases cited therein)).

We note initially that the flash messages described in Cardo's testimony did not mention anyone's identity or that there had been a murder. It is clear that the State did not present Cardo's testimony to prove the truth of the statement that "that vehicle was taken in a

carjacking and a shooting from Ford City Mall." The trial court had already instructed the jury that the similar testimony from the prior flash message was to be considered only "to show what the officer did when he did it next, if anything." Cardo testified after Southward and Harrison, both of whom had already recounted that they saw defendant in the green Intrepid and Southward testified as to defendant's vehicular hijacking and shooting of Rose Newburn. We find that the flash messages were not improperly offered to link defendant to the carjacking and shooting.

The admission of an out-of-court statement that is not offered to prove the truth of the matter asserted but rather to explain the investigatory procedure followed in a case is proper (see, *e.g.*, *People v. Jones*, 153 Ill. 2d 155, 160-61 (1992)) and to show that the police officers had probable cause to arrest on the basis of the communication (see *People v. Louisville*, 241 Ill. App. 3d 772, 781 (1992)). Because Cardo was not part of the initial investigation, the admission of the flash messages explained the course of the investigation, the subsequent actions of the police officers, which included a high-speed chase, a car crash into a CTA elevated-train pillar, a foot chase, and the basis for placing defendant under arrest.

Defendant cites *In re Guttierrez*, 71 Ill. App. 3d 537 (1979), and *People v. Jura*, 352 Ill. App. 3d 1080 (2004), in support of his contention that the flash messages contained inadmissible hearsay. However, these cases are distinguishable. *In re Guttierrez* involved a flash message that was broadcast of an offender who was a "male white, Mexican, 5 feet 5 inches in height, wearing dark trench coat and ski mask." *In re Guttierrez*, 71 Ill. App. 3d at 538. The appellate court held that the trial court's "substantive reliance" on the flash message was improper, in particular since there was no other evidence that the offender was Hispanic and that the evidence was clearly offered to prove both that respondent made the statement and the verity of its contents. *In re Guttierrez*, 71 Ill. App. 3d at 541. In *Jura*, the appellate court held that the testimony admitted had the effect of proving the matter asserted, that the defendant was the individual who committed the offense, and that it failed to satisfy any other relevant, nonhearsay purpose. *Jura*, 352 Ill. App. 3d at 1088.

Defendant finally asserts that admitting testimony of the flash messages violated his sixth amendment right to be confronted by

witnesses against him. See U.S. Const., amend. VI. The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 158 L. Ed. 2d 177, 197 n.9, 124 S. Ct. 1354, 1369 n.9 (2004).

As we found earlier, the testimony of the flash messages was admitted into evidence for purposes other than establishing the truth of the matter asserted and the jury was so instructed by the trial court.


### 2. Alleged Prosecutorial Error During Rebuttal Argument

The defendant's second point for review is that he should be granted a new trial because the State mocked defendant during closing argument, compared the strength of its case against defendant to other cases, and claimed that the jury had to believe all of the State's witnesses were lying to acquit defendant.

Defendant alleges the mocking occurred when the prosecutor began his rebuttal argument by stating, "Bravo. Bravo for Mr. Wonderful over here. Bravo that he didn't fight with Officer Cardo. Bravo that he didn't struggle with Officer Cardo. Bravo. Let's give him a hand. He's Mr. Wonderful." Defendant's objections "to the theatrics" and that "this is not proper argument" prompted the court to remark, "Stick to the facts, Mr. [Prosecutor]."

Defendant argues that the prosecutor's performance was calculated to inflame the passions of the jury and cause the jury to despise defendant, citing *People v. Johnson*, 119 Ill. 2d 119, 139 (1987) (it is improper to refer to the defendant as an animal), and *People v. Johnson*, 208 Ill. 2d 53, 80 (2003) (it is improper to refer to defendant as evil). Defendant concluded by arguing the jury should not have been goaded into despising him.

The State argues that this was proper rebuttal argument because it was made in direct response to the argument made by defense counsel. In her closing statement, defense counsel said:

> "So, let's look at the other evidence. The arresting officer, Officer Cardo, who handle[d] the chase. He took [defendant] into custody at 5:56 p.m. on March 24th. After a short foot chase, [defendant] did not resist arrest. He did not try to strike or shoot at any of the officers. He did not grab the gun from the

vehicle. He did not try to toss the gun. The officer told you, after a short foot chase, [defendant] did not resist arrest."

We agree with the State that the prosecutor was not attempting, as defendant claims, to "cause the jury to despise the defendant," but rather was responding to defense counsel's argument. The wide latitude extended to prosecutors during their closing remarks has been held to include some degree of both sarcasm and invective to express their points. See *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 146 (1998); *People v. Burton*, 338 Ill. App. 3d 406, 418 (2003).

Defendant next contends that the prosecutor improperly compared the strength of the case against defendant to other cases when he argued, "The evidence in this case is overwhelming. Most cases have eyewitness testimony, and that's it. Some cases don't have DNA, or fingerprints, or gunshot residue, or ballistics. Other than fingerprints, you've got it all. This case has it all." An objection to this argument was overruled.

Defendant asserts that the prosecutor may not argue assumptions or facts not based upon the evidence in the record, citing *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). He contends this argument was prejudicial because it implied that guilt depends upon the quantity and variety of evidence presented, rather than upon the quality of the evidence.

The State argues that it is well established that comments by a prosecutor on the strength of the State's evidence are permitted. See, *e.g.*, *People v. Emerson*, 122 Ill. 2d 411, 434 (1987). The clear focus of the prosecutor's argument was the overwhelming strength of the evidence presented in this case. The State also argues that the remarks here bear out that there was eyewitness testimony, DNA analysis, gunshot residue evidence, and ballistics evidence, and that was all the prosecutor was pointing out with his remarks. We do not agree with defendant's contention that the prosecutor's argument "was prejudicial because it implied that guilt depends upon the quantity and variety of evidence presented, rather than upon the quality of the evidence."

With regard to defendant's claim that the State improperly argued the jury would have to believe all the State's witnesses were lying in order to acquit defendant, he points to the prosecutor's argument that

"[t]hey would have you believe that each of those witnesses that testified from the jury box, from the witness stand, got in here and lied to put a case on [defendant]." Defendant argues that he did not testify, and because the prosecutor referred to the defense's "story," the argument told the jury that it could not *acquit* defendant unless it believed each of the State's witnesses was lying.

The State argues that defendant misstates the proper application of the law, citing *People v. Coleman*, 158 Ill. 2d 319 (1994), wherein this court examined a similar complaint by a defendant. In examining the issue, this court drew a distinction between situations where a prosecutor permissibly argues that a jury would have to believe the State's witnesses were lying in order *to believe* the defendant's version of events and where a prosecutor improperly argues that a jury would have to believe the State's witnesses were lying in order *to acquit* defendant. *Coleman*, 158 Ill. 2d at 346. Since in *Coleman* the argument represented the former, and was a direct response to a defense attack on the credibility of the State's witnesses, the argument was not a misstatement of the law or an attempt to distort the burden of proof. The same is true here. See *People v. Pecoraro*, 144 Ill. 2d 1, 16 (1991); *People v. Williams*, 147 Ill. 2d 173, 232 (1991).

Defendant cites several other cases in support of his argument, but they are distinguishable. In *People v. Crossno*, 93 Ill. App. 3d 808, 822 (1981), and *People v. Miller*, 302 Ill. App. 3d 487, 497 (1998), the prosecutors improperly distorted the burden of proof by incorrectly intertwining the burden with the jury's credibility determinations. That did not happen in this case. Rather, the prosecutor was simply responding to defendant's attack on the credibility of the State's witnesses.

We find that the three complained-of arguments by the prosecutor during rebuttal argument were not improper.


### 3. Bias Against Gang Members

The third point for review is that defendant is entitled to a new trial because he was tried by a juror with a bias against gang members. During the examination of Juror A by defense counsel, the following colloquy ensued:

"[Defense counsel]: Would the fact that [defendant], our

client, was a member of a street gang prevent you from giving him a fair and impartial hearing?

[Juror A]: That might, yes.

[Defense counsel]: In what way?

[Juror A]: Well, my husband used to be involved with gang crimes, and he talked a lot about the different offenders involved and victims and that kind of thing. And so–and I do have some views about gang members and that whole–

[Defense counsel]: I guess the question is, would you be able to put that aside, or are your feelings that strong that you wouldn't be able to put it aside?

[Juror A]: I think I could put it aside."

Defendant now argues that the trial court committed plain error in seating Juror A because she said she had a bias against gang members; that she only thought she could put the bias aside, and therefore she was not an impartial juror. Because the jury was not impartial, defendant argues he is entitled to a new trial and sentencing hearing.

The State argues that the seating of Juror A on the jury did not constitute error. "In addressing defendant's plain-error contention, it is appropriate to determine whether error occurred at all." *People v. Bannister*, 232 Ill. 2d 52, 65 (2008); *People v. Harris*, 225 Ill. 2d 1, 31 (2007).

After the above colloquy between Juror A and defense counsel, both the State and defense counsel were given the opportunity to and did pose additional questions to Juror A. Thereafter both the State and defense counsel accepted Juror A without any further discussion or challenge with regard to the now claimed bias. Defendant does not argue that the court was required, *sua sponte*, to challenge or decline to seat Juror A. Indeed, in *People v. Metcalfe*, 202 Ill. 2d 544, 557 (2000), we held that while a trial court has the discretion to remove a juror *sua sponte*, it has no duty to do so. Accordingly, the trial judge here did not commit any error in seating Juror A. In any event it is evident, given Juror A's responses, that she would be fair and impartial. Clearly, defendant's trial counsel agreed with that assessment.

We find that the trial court did not err in seating Juror A and defendant was not denied his constitutional right to be tried by a fair and impartial jury.

### 4. Potential Juror Excused for Cause

Defendant's fourth point for review is whether the trial court erred when it excused a potential juror (Juror B) who merely would have had difficulty in imposing a death sentence. During the examination of Juror B, the following ensued:

"THE COURT: I mentioned in the courtroom, if the defendant is found guilty of the offenses charged in this case, the [S]tate will seek the death penalty in a separate sentencing proceeding. Do you have any scruples, by which I mean strong feelings by reason of religion, morals, or conscience, against the imposition of the death penalty?

[Juror B]: Generally, it's not something that I agree with.

THE COURT: Are your beliefs such that regardless of the facts of the case or the background of the defendant, that under no circumstances could you consider signing a verdict directing the Court to sentence the defendant to death?

[Juror B]: I think I would find that difficult.

THE COURT: Would there be circumstances that you would be able to do that, or you think you could? Whether or not it's easy or not, that's not a question right now but–

[Juror B]: I honestly don't know how I feel in the situation, itself, but certainly in a general principle, it's–I think it would be difficult for me to feel that I had sentenced someone to death.

THE COURT: Okay. Would your beliefs about the death penalty prevent or substantially impair your ability to reach a fair and impartial decision as to whether the defendant was guilty?

[Juror B]: No, I don't think so.

THE COURT: Do you have any strong feelings in favor of the death penalty? You have already answered that, but I want you to answer that again.

[Juror B]: No.

THE COURT: Are your beliefs such that regardless of the facts of the case or the background of the defendant, that if the defendant were found guilty as charged, you would automatically vote to impose the death penalty and not consider signing a verdict which would result in a sentence of life

imprisonment?

[Juror B]: No.

THE COURT: You'd be able to look at both of those aspects–

[Juror B]: I think so.

THE COURT: –before making up your mind?

[Juror B]: Yes.

THE COURT: If there is such a sentencing hearing that I'm talking about, at the conclusion of that hearing or the conclusion of your deliberations, you could be asked to sign a verdict that would direct the Court to impose a sentence of death.

Do you think if the facts–if you think the facts and the background of the defendant would be appropriate, do you think you'd be able to sign such a verdict?

[Juror B]: I honestly don't know. I certainly would find that difficult.

THE COURT: Nobody said its going to be easy, but–and it's hard to imagine or you're in a position where it's maybe the first time you have thought about this particular situation, but it's kind of–is that the best answer you can give us at this time?

[Juror B]: I guess I don't know exactly how I would react in the situation, but certainly, it's not something that I'm comfortable with.

* * *

[Defense counsel]: As you already know, if [defendant] is convicted, there may be a hearing to determine if he receives the death penalty. You would hear evidence against him in aggravation, evidence for him in mitigation. Would you be able to keep an open mind in considering this question?

[Juror B]: The question being?

[Defense counsel]: Death or no death, or death versus life imprisonment, whatever way.

[Juror B]: I would certainly try to.

[Defense counsel]: Would you be able to though?

[Juror B]: I just don't know how to answer that. Certainly

it's not something that I'm comfortable with, and I don't know how I would react in the situation, but–I don't know that I can give you a better answer."

After examination of Juror B concluded, the following colloquy ensued between the court and counsel outside the presence of the prospective jurors:

"THE COURT: Anything [*sic*] want to say about [Juror B]?

[Assistant State's Attorney]: We'd ask he be excused for cause. He was so equivocal in his responses and uncomfortable with the concept that he shows clearly he wouldn't be able to sign the verdict form.

[Defense counsel]: I'd object to cause. Certainly in death penalty, many people here are uncomfortable, and he did say, basically, he didn't–he did say he'd be able to consider and–he said he would consider it even though it was difficult.

THE COURT: Looking at the totality of his answers, however, I don't think he's going to be able to sign a verdict in this case, even if he thought the evidence warranted it. I am going to excuse him for cause based on the totality of his answers."

Defendant argues that a trial court may not exclude a prospective juror for cause for voicing general reservations about capital punishment, citing *People v. Seuffer*, 144 Ill. 2d 482, 505 (1991), or simply because the person opposes the death penalty and cites *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777 (1968). *Witherspoon* and its progeny provide that the right to an impartial jury, guaranteed by the sixth and fourteenth amendments to the United States Constitution, prohibits removal of a prospective juror for cause where the prospective juror voices only general objections to the death penalty. *People v. Gilliam*, 172 Ill. 2d 484, 509 (1996). In determining whether a prospective juror in a capital case may be removed for cause because of the person's views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581,

-24-

589, 100 S. Ct. 2521, 2526 (1980). "The trial judge is in a 'superior position to gauge the meaning of the prospective juror's responses' to the examination, and the judge's determination is therefore entitled to deference." *People v. Tenner*, 157 Ill. 2d 341, 363 (1993), quoting *People v. Emerson*, 122 Ill. 2d 411, 439 (1987).

In *People v. Harris*, 225 Ill. 2d 1 (2007), this court examined a challenge to an exclusion for cause where the potential juror gave "ambiguous" responses to questions regarding whether he could sign a verdict sentencing a defendant to death, first indicating that he would automatically vote against the death penalty and then later responding that it was a "possibility" that he would sign a verdict of death. *Harris*, 225 Ill. 2d at 36-37. In finding that the juror was properly dismissed, this court noted that " '[i]t is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court's discretion.' " *Harris*, 225 Ill. 2d at 37, quoting *People v. Shaw*, 186 Ill. 2d 301, 317 (1998); see also *People v. Sims*, 192 Ill. 2d 592, 632-33 (2000).

Based on Juror B's repeated equivocal responses to questions from the court and counsel about his ability to sign a verdict for the death penalty, we hold that the trial court did not abuse its discretion in dismissing Juror B for cause. *Harris*, 225 Ill. 2d at 34-39; *Tenner*, 157 Ill. 2d at 359-63.

### 5. Jury Not Instructed on Elements of the Felonies in the Felony-Murder Aggravating Factor

Defendant's fifth point for review is that his death sentence must be vacated because the jury was not instructed on the elements of the felonies in the felony-murder aggravating factor. After argument and instruction from the court during the death penalty phase of the sentencing hearing, the jury found defendant eligible for the death penalty based on two statutory factors: (1) defendant was convicted of murdering two or more persons, and (2) Rose Newburn was killed during the course of the commission of another felony. 720 ILCS 5/9–1(b)(3), (b)(6) (West 2006).

Defendant claims that none of the eligibility-stage instructions set forth the elements the jury had to find to decide whether defendant committed armed robbery, aggravated kidnapping, or aggravated

vehicular hijacking, the underlying felonies in the felony-murder aggravating factor. He concludes this was plain error because it deprived him of both a substantial right and a fair sentencing hearing, citing *People v. Fuller*, 205 Ill. 2d 308 (2002), and *People v. Ramey*, 151 Ill. 2d 498 (1992). In addressing defendant's plain-error argument, we will first determine whether error occurred at all. *Bannister*, 232 Ill. 2d at 65.

The State argues, and defendant concedes, that the instructions defendant claims were lacking during the eligibility phase of his hearing were given to the same jury prior to deliberation during the guilt phase of his trial, which took place earlier the same day. The guilt-phase instructions included separate elements instructions for armed robbery, aggravated kidnapping, and aggravated vehicular hijacking. Thus, the jurors were aware of the elements of the underlying felonies in the felony-murder aggravating factor and did not need to be reinstructed before deliberating on the eligibility phase of the proceedings.

In *Ramey* the trial court did not instruct the jury that the State must prove that defendant " 'acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual' " (*Ramey*, 151 Ill. 2d at 539-40, quoting Ill. Rev. Stat. 1985, ch. 38, par. 9–1(b)(6)(b)), "[a]n essential element which the State was required to prove in order to establish the existence of the sixth aggravating factor" (*Ramey*, 151 Ill. 2d at 545). This court also found that "the sentencing jury never found that the defendant acted intentionally or knowingly." *Ramey*, 151 Ill. 2d at 545. The court then vacated the defendant's death sentence and remanded for a new sentencing hearing.

In *Fuller*, the jury instructions, "just like those in *Ramey,* failed to mention that the defendant acted with knowledge or intent in causing the death of the victim. Also like *Ramey*, the required finding was not made by the jury at any other stage of the proceeding ***." *Fuller*, 205 Ill. 2d at 344. Just like in *Ramey,* this court vacated defendant's sentence and remanded for a new sentencing hearing. *Fuller*, 205 Ill. 2d at 346.

The *Fuller* and *Ramey* cases are distinguishable because, here, the trial court did instruct the jury in the sentencing phase that "defendant acted with the intent to kill the murdered person, or with the knowledge that his acts created a strong probability of death or great bodily harm

to the murdered person." Furthermore, unlike *Ramey* and *Fuller*, the jury was instructed at the guilt phase on the underlying elements of the felonies in the felony-murder aggravating factor.

Under the circumstances of this case, where the trial court instructed this same jury as to the elements of the predicate felonies for felony murder during the guilt phase of the trial, we find the trial court did not err by failing to repeat those instructions during the eligibility phase.

### 6. Evidence of Privileges Received by Prison Inmates

Defendant's sixth point for review is that the State presented irrelevant evidence of privileges received by prison inmates. Glen Jackson, the chief records officer for the DOC, testified regarding privileges offered to inmates serving a term of natural life imprisonment. He explained that these inmates are allowed privileges based upon their good behavior. They initially could be assigned to a maximum-security facility, where there are fewer programs than in other institutions, but they could be stepped down to a medium-security facility based upon their behavior. He said that the natural life inmates received recreation privileges like other inmates, including going to the yard for two hours a day to play basketball, softball, and lift weights; that they were able to engage in vocational training, such as educational adult basic education, General Educational Development (GED) programs, culinary arts programs, wood shop, and auto shop; and that they were able to use the library and the commissary, as well as have a television and a radio in their cell. In a typical day, the inmates are counted in the morning and then eat breakfast. After breakfast, inmates go to their assignments and then eat lunch. After lunch they go to the yard, then to dinner, and after dinner they return to their cells.

Defendant's motion *in limine* to preclude the State from presenting this evidence was denied.

Defendant argues that "[evidence] is not proper at the sentencing hearing if it does not bear on the aggravating or mitigating factors, the circumstances of the offense or the character or rehabilitative potential of the particular defendant," citing *People v. Barrow*, 133 Ill. 2d 226, 280 (1989). He contends the evidence about prison privileges did not bear on his character or the nature of the offense, and it was therefore irrelevant.

Defendant also argues that this prison-privileges evidence was prejudicial when the prosecutor in closing argument said that defendant should be sentenced to death "[b]ecause if he knows he's going to spend the rest of his life walking around the yard, lifting weights, playing basketball, watching TV, he'll do whatever he wants. He'll take that sentence as a joke." The State also appears to refer to this evidence, stating, "Don't give him what he wants. Life in general population is like sending him to his room."

The State contends that the trial court properly admitted evidence regarding privileges received by inmates at the DOC, citing *People v. Smith*, 176 Ill. 2d 217 (1997). In *Smith* we stated: " 'Wide latitude is granted to the parties in introducing evidence in aggravation and mitigation at a capital sentencing hearing. The testimony presented need not satisfy the more restrictive rules of evidence that govern the guilt-innocence phase.' *People v. Tenner*, 157 Ill. 2d 341, 380 (1993); 720 ILCS 5/9–1(e) (West 1994). Rather, the only requirement is that the evidence be relevant and reliable." *Smith*, 176 Ill. 2d at 242-43. See also *People v. Caffey*, 205 Ill. 2d 52, 125 (2001).

The State and defendant agree that the only issue is whether the prison-privileges evidence was relevant.

Defendant relies heavily on the South Carolina Supreme Court case of *State v. Burkhart*, 371 S.C. 482, 640 S.E.2d 450 (2007). During the sentencing phase in that capital case, the Director of Inmate Classification for the Department of Corrections testified that an inmate receiving a sentence of life without parole was eligible to receive privileges that "include[d] access to the yard, work, education, meals, canteen, phone, library, recreation, mail, television, and outside visitors." *Burkhart*, 371 S.C. at 487, 640 S.E.2d at 453. On cross-examination, the Director acknowledged that prison life is "very regimented" and "is not a country club." *Burkhart*, 371 S.C. at 487, 640 S.E.2d at 453. Burkhart presented evidence through his own witness that prison is a harsh environment with violent predators where one's freedom is severely curtailed. *Burkhart*, 371 S.C. at 487, 640 S.E.2d at 453.

The South Carolina court stated: "[E]vidence in the sentencing phase of a capital trial must be relevant to the character of the defendant or the circumstances of the crime. We are aware of the tension between evidence regarding the defendant's adaptability to prison life, which is

clearly admissible, and this restriction on the admission of evidence regarding prison life in general. We note, however, that evidence of the defendant's characteristics may include prison conditions if narrowly tailored to demonstrate the defendant's personal behavior in those conditions." (Emphasis omitted.) *Burkhart*, 371 S.C. at 488, 640 S.E.2d at 453.

The five-member South Carolina Supreme Court unanimously found that the evidence concerning prison conditions was not relevant and should not have been admitted into evidence. Based on a South Carolina statute, three of the justices found the admission of this evidence was reversible error and two found it was harmless error. The majority stated, "A capital jury may not impose a death sentence under the influence of any arbitrary factor. S.C. Code Ann. §16–3–25(C)(1) (2003). When the jury is invited to speculate about irrelevant matters upon which a death sentence may be based, §16–3–25(C)(1) is violated. *State v. Sloan*, 278 S.C. 435, 298 S.E.2d 92 (1982). Accordingly, we reverse appellant's death sentence and remand for resentencing." *Burkhart*, 371 S.C. at 488-89, 640 S.E.2d at 453.

The dissenting justices stated they would find that although the trial court admitted irrelevant evidence during the sentencing proceeding, they could find nothing that indicated the introduction of this evidence prejudiced the defendant. *Burkhart*, 371 S.C. at 490, 640 S.E.2d at 454 (Toal, C.J., dissenting, joined by Burnett, J.). They further held that the South Carolina statute was subject to harmless-error analysis. *Burkhart*, 371 S.C. at 490-95, 640 S.E.2d at 454-57 (Toal, C.J., dissenting, joined by Burnett, J.).

Here, the State asserts that the evidence of inmate privileges was offered to help "the jurors make their determination regarding whether defendant would be able to adjust to a life of incarceration." It argues that the South Carolina Supreme Court recognized that there is an important distinction between permissible evidence designed to show a defendant's adaptability to prison life and evidence of prison conditions in general. *Burkhart*, 371 S.C. at 488, 640 S.E.2d at 453. However, at trial, the State did not argue that the evidence of privileges in prison showed that defendant could not adapt to prison life. Rather, the prosecutor argued that the prison privileges meant life in prison was too good for defendant. Accordingly, the prison-privileges evidence was not relevant to the circumstances of the offense or the character or

rehabilitative potential of defendant (*People v. Williams*, 97 Ill. 2d 252, 301 (1983)) and it should not have been admitted.

Because of this error, defendant argues that this court should grant him a new sentencing hearing. We have previously found that the admission of improper aggravation evidence during a sentencing proceeding is subject to harmless-error analysis and reversal is not mandated in every instance. *People v. Towns*, 174 Ill. 2d 453, 469 (1996); see also *People v. Chapman*, 194 Ill. 2d 186, 246 (2000). Here the State's evidence was very strong and showed that defendant was a repeat offender with a history of preying on innocent victims for whom he showed no remorse or concern. The State's case included 23 witnesses in aggravation, many of them DOC officials. These DOC witnesses discussed defendant's many disciplinary infractions during his incarcerations, which included fights with other inmates, abusive behavior toward guards and civilian staff, and refusal to conform to the rules and regulations of the institutions. The State also offered testimony from Pamela Tiggins, who told how defendant sexually assaulted her while holding an ice pick to her friend's neck and testimony regarding defendant's murder of Alfred Evans, whom he gunned down from the back, allegedly in retaliation for the killing of another gang member.

Defendant, on the other hand, presented testimony from family members and a clinical psychologist, all of whom spent most of their time detailing defendant's childhood as the reason behind his criminal behavior. This mitigation did not present any reason sufficient to preclude the death penalty and was far outweighed by the aggravation evidence.

We find that the error in admitting the improper testimony was harmless beyond a reasonable doubt and that no prejudice resulted to defendant from its admission.

### 7. The Right to Confront Witnesses at the Capital Sentencing Hearing

Defendant's seventh point for review is that the State violated his right to confront witnesses when a Department of Corrections records keeper testified for the State about defendant's prison disciplinary record and an assistant State's Attorney read to the jury a statement and the grand jury testimony of a witness to the killing that resulted in

-30-

defendant's prior murder conviction.

Defendant argues that the jury learned at the eligibility stage that defendant had pleaded guilty to the murder of Alfred Evans. At that stage of the sentencing hearing, the State told the court that Mark Carrington, a witness to that murder, was dead, but the State still wanted to present Carrington's grand jury testimony about Evans' murder. The defense objected, but the court found that because Carrington was under oath before the grand jury and defendant had pleaded guilty to the murder, the evidence was relevant and reliable and was therefore admissible.

The State placed into evidence Carrington's signed statement to the police and a transcript of his grand jury testimony. Barry Gross then testified that as an assistant State's Attorney in 1985, he conducted the grand jury investigation into Evans' murder. Gross read Carrington's grand jury testimony to defendant's sentencing jury. Carrington testified that he met with defendant on March 15, 1985, when defendant was a "general," and Carrington was a member, of the Gangster Stones. Defendant told Carrington to accompany him to get narcotics. They walked to a building a block away and defendant told Carrington to wait outside. Defendant went inside and talked to two men in the hallway. Defendant pulled a gun and shot the shorter of the two men in the back. As Carrington fled, he heard more shots. Carrington met defendant later that night and defendant told him he had done it because "Fred" had been shot earlier. Carrington said he was not told more because "[g]enerals don't really talk. They don't really do nothing else about what they do."

Defendant requested a mistrial or, in the alternative, that the testimony be stricken, because he was unable to cross-examine Carrington. Again, the trial court stated that the evidence was relevant and reliable.

The court also overruled defendant's objection that his right to confront witnesses would be violated if Glen Jackson, the DOC record keeper, should be permitted to testify concerning the details of certain violations reported in defendant's master file. The court ruled the evidence was admissible. Jackson testified that defendant accumulated 133 rules violations between 1983 and 2000 and provided more specific information as to five of those violations as set forth below.

First, Jackson testified that on September 11, 1990, while defendant was at Hill Correctional Center, defendant approached an officer and berated him because the officer would not let defendant leave the yard early. Forty or fifty inmates watched, and the officer felt intimidated. Jackson said a disciplinary ticket was filed and the adjudicatory committee found defendant guilty of the charges.

Next Jackson stated that on February 12, 1991, defendant was housed at Illinois River Correctional Center and was issued a ticket for insolence, unauthorized movement, and disobeying a direct order. Jackson explained that defendant was asked to leave the dietary area because he was finished eating, and he refused to comply with three orders to leave the area. Defendant left when a higher ranking officer ordered him to do so. The adjudicatory committee found him guilty of those charges.

Jackson also testified that defendant was issued another ticket on May 19, 1992, at Illinois River Correctional Center for creating a dangerous disturbance, insolence, and unauthorized movement. Defendant attempted to avoid a shakedown as he was leaving lunch. As a number of other inmates watched, defendant became loud and insolent when a lieutenant asked him to empty his pockets. The adjudicatory committee found defendant guilty of insolence and unauthorized movement, but not of creating a dangerous disturbance.

Jackson further testified that defendant received a ticket on January 23, 1993, at the Illinois River Correctional Center for intimidation, threats, disobeying a direct order, insolence, violation of rules, and sexual misconduct. An officer had seen defendant holding a door open, and as the officer shut it, defendant pushed past him into a different wing of the facility. Defendant then refused to return to his wing, refused to produce his identification card, swore at the officer, and shook his finger in the officer's face. When defendant finally left, he started yelling "turn around, I got something for you" and when the officer turned around, he saw defendant with his pants pulled down and his penis exposed through his shorts. The adjustment committee found him guilty of all charges except sexual misconduct.

Finally, Jackson testified that on January 25, 1994, defendant was ticketed for insolence, intimidation, and threats based on his going to the correctional office, telling the reporting officer that he did not like being at Danville Correctional Center and that he wanted to go back to

Pontiac. Defendant said, "I just want to let you know, my name is Banks, I'm a Stone, and I want to see the warden about getting out of here. I'm telling you, I'm letting you know, you have been warned, if anything happens, it's on you." The adjudicatory committee found defendant guilty.

Defendant contends that the admission of Carrington's statements through Gross' testimony, and the admission of the various prison guards' accounts of rule violations through Jackson's testimony, violated defendant's sixth and fourteenth amendment right to confront witnesses, citing *Crawford v. Washington*, 541 U.S. 36, 58 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). The trial court's ruling that the evidence was relevant and reliable did not address the defendant's confrontation objection.

The sixth amendment's confrontation clause, which applies to both federal and state prosecutions (*Crawford*, 541 U.S. at 42, 158 L. Ed. 2d at 187, 124 S. Ct. at 1359), provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. In *Crawford*, the Supreme Court further interpreted the confrontation clause and held that the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The Court in *Crawford* declined to spell out a comprehensive definition of "testimonial," but it found that: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

The State argues that both the testimony from the records officer and the testimony recounting a deceased witness' grand jury testimony were properly admitted in aggravation during defendant's sentencing hearing. The ordinary rules of evidence are relaxed at the aggravation/mitigation stage of a capital sentencing hearing. *People v. Caffey*, 205 Ill. 2d 52, 125 (2001). The only requirement for the admissibility of evidence at this stage of a capital sentencing hearing is that the evidence be relevant and reliable. *Caffey*, 205 Ill. 2d at 125. Furthermore, "it is well settled that the introduction of hearsay evidence in a capital sentencing hearing violates neither the due process clause

(*People v. Jones*, 94 Ill. 2d 275, 286 (1982)), nor the confrontation clause (*People v. Brown*, 172 Ill. 2d 1, 49 (1996)). Therefore, the arguments based on the sixth and fourteenth amendments also fail." *People v. Jackson*, 182 Ill. 2d 30, 83 (1998).

These well-established rules in Illinois are consistent with *Williams v. New York*, 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079 (1949), where the Supreme Court stated:

> "Highly relevant–if not essential to [a court's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams*, 337 U.S. at 247, 93 L. Ed. at 1342, 69 S. Ct. at 1083.

There is nothing in *Crawford* to indicate that the confrontation clause does or does not apply to the aggravation/mitigation phase of a capital sentencing hearing. There is a split of authority on the issue by the courts that have considered the issue. The parties have cited cases which hold that the confrontation clause does not apply, namely, *People v. Jackson*, 182 Ill. 2d 30, 83 (1998), *Szabo v. Walls*, 313 F.3d 392 (7th Cir. 2002), *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), *United States v. Jordan*, 357 F. Supp. 2d 889 (E.D. Va. 2005), *United States v. Johnson*, 378 F. Supp. 2d 1051 (N.D. Iowa 2005), *State v. McGill*, 213 Ariz. 147, 140 P.3d 930 (2006), *State v. Stephenson*, 195 S.W.3d 574 (Tenn. 2006), and *Summers v. State*, 122 Nev. 1326, 148 P.3d 778 (2006); and cases which hold that the right to confront witnesses does apply, namely, *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir. 1982), *United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Cal. 2006), *Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005), *State v. Bell*, 359 N.C. 1, 603 S.E.2d 93 (2004), and *Rodriguez v. State*, 753 So. 2d 29 (Fla. 2000).

Defendant contends that the argument against applying the confrontation clause to the aggravation/mitigation phase of a capital sentencing hearing relies upon *Williams*. But, defendant argues, a growing number of jurists have questioned the continued vitality of *Williams*. Because the sixth amendment right to confrontation was not

extended to the states until over 15 years after *Williams* was decided, *Williams* was decided on due process grounds and it "is thus quite questionable whether *Williams* is controlling with respect to the determination of whether the Sixth Amendment right to confrontation extends to capital sentencing hearings." *United States v. Hall*, 152 F.3d 381, 405 n.13 (5th Cir. 1998). "The bases of the *Williams* decision, written in 1949, well before the modern death penalty era of *Furman* [*v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)] and *Gregg* [*v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)], have been eroded as applied to capital cases." *United States v. Taveras*, 424 F. Supp. 2d 446, 457 (E.D.N.Y. 2006).

A similar argument was presented to this court in *People v. Patterson*, 217 Ill. 2d 407 (2005), which involved the question of whether a *Crawford* violation was subject to harmless-error review. In *Patterson* we stated:

> "What defendant is arguing, in essence, is that *Crawford* implicitly overruled *Harrington* [*v. California*, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969)], [*Delaware v.*] *Van Arsdall*, [475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986)] and any other Supreme Court decision holding that confrontation clause violations are subject to harmless-error review. *Crawford* does not explicitly overrule these decisions, and we may not assume an implicit overruling of a previous Supreme Court decision. *Agostini v. Felton*, 521 U.S. 203, 237, 138 L. Ed. 2d 391, 423, 117 S. Ct. 1997, 2017 (1997) (reaffirming rule that it is the prerogative of the Supreme Court to overrule its own decisions). In view of the well-established rule, pre-*Crawford*, that confrontation clause violations were subject to harmless-error analysis, and the numerous post-*Crawford* decisions applying harmless-error review to *Crawford* violations, as well as the Supreme Court's admonition not to assume the implicit overruling of a Supreme Court decision, we conclude that *Crawford* violations are subject to harmless-error analysis." *Patterson*, 217 Ill. 2d at 427-28.

Applying the rationale of *Patterson*, we hold that the confrontation clause does not apply to the aggravation/mitigation phase of a capital sentencing hearing. *People v. Jackson*, 182 Ill. 2d 30, 83 (1998). As we stated earlier, the only requirement for the admissibility of evidence at

this stage of a capital sentencing hearing is that the evidence be relevant and reliable. *People v. Caffey*, 205 Ill. 2d 52, 125 (2001).

We further find that the trial court did not abuse its discretion in admitting the complained-of hearsay evidence. First, the testimony of Glenn Jackson, the chief records officer, detailed defendant's prior behavior in the Department of Corrections, which directly impacts defendant's potential for rehabilitation and his ability to adjust to a life of incarceration. Traditionally, this type of evidence has been found relevant and admissible. *People v. Casillas*, 195 Ill. 2d 461, 494 (2000); *People v. Terrell*, 185 Ill. 2d 467, 506 (1998); *People v. Ward*, 154 Ill. 2d 272, 328-29 (1992).

The testimony from former Assistant State's Attorney Barry Gross was also properly admitted at the sentencing hearing. Gross testified that he presented a now-deceased witness named Mark Carrington to the grand jury in 1985, and then proceeded to read Carrington's sworn testimony to defendant's sentencing jury. In that testimony before the grand jury, Carrington described watching defendant shoot Alfred Evans in the back. The testimony was also reliable, as it consisted of Carrington's signed handwritten statement and his sworn grand jury testimony regarding a crime to which defendant pleaded guilty, and it was relevant because it shed light for the jurors on not only the circumstances surrounding defendant's first conviction for murder, but also his street gang affiliations.

### 8. Jury Instructions Regarding Consideration of Mitigation Evidence

Defendant's eighth point for review is that the trial court erred when it instructed the jury that the defendant should be sentenced to death if no mitigating factor was sufficient to preclude a death sentence, because that prevented the jury from performing its constitutionally required task of measuring the totality of the mitigation against the aggravation. Defendant contends that the instructions informed the jury that it had to consider each mitigating factor singly rather than aggregating the mitigation factors in determining whether defendant should be sentenced to death. Therefore he argues that the jurors were prevented from reaching the decision that death was inappropriate because they had to weigh each mitigating factor against all of the aggravation. Finally, he

contends that a juror who believed that all of the mitigation outweighed the aggravation could not conclude death was inappropriate unless that juror also believed that there was one single mitigating factor that outweighed all of the aggravation.

Defendant elected to be sentenced under the death penalty statute in effect at the time of the crime on March 24, 2001, rather than the statute in effect at the time of his trial in 2006. The instructions given by the court, which defendant now argues are objectionable, are Illinois Pattern Jury Instructions, Criminal, Nos. 7C.05 and 7C.06 (4th ed. 2000) (IPI Criminal 4th), which instructions were promulgated for use under the death penalty statute in effect at the time of the crime. Those instructions were as follows:

"Under the law, the defendant shall be sentenced to death if you unanimously find that there is no mitigating factor sufficient to preclude imposition of a death sentence.

If you are unable to find unanimously that there is no mitigating factor sufficient to preclude imposition of a death sentence, the court will impose a sentence of natural life imprisonment, and no person serving a sentence of natural life imprisonment can be paroled or released, except through an order by the Governor for executive clemency." See IPI Criminal 4th No. 7C.05.

"In deciding whether the defendant should be sentenced to death, you should consider all the aggravating factors supported by the evidence and all the mitigating factors supported by the evidence. Aggravating factors are reasons why the defendant should be sentenced to death. Mitigating factors are reasons why the defendant should not be sentenced to death.

Aggravating factors include:

First: The defendant has been convicted of murdering two or more persons so long as the deaths were the result of an intent to kill more than one person; or the murdered person, Rose Newborn, was killed in the course of another felony if the murdered person was actually killed by the defendant; and, in performing the acts which caused the death of the murdered person, the defendant acted with the intent to kill the murdered person or with the knowledge that his acts created a strong

-37-

probability of death or great bodily harm to the murdered person; and, the other felony was one or more of the following: armed robbery, aggravated kidnaping, or aggravated vehicular hijacking.

Second: Any other reason supported by the evidence why the defendant should be sentenced to death.

Where there is evidence of an aggravating factor, the fact that such aggravating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.

Mitigating factors include:

First: Any or all of the following if supported by the evidence:

The murder was committed while the defendant was under the influence of an extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution.

The defendant has expressed remorse for the crime.

The defendant has plead guilty on previous cases.

The defendant's background includes a history of extreme emotional or physical abuse.

Second: Any other reason supported by the evidence why the defendant should not be sentenced to death.

Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.

If you unanimously find from your consideration of all the evidence that there is no mitigating factor sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there is no mitigating factor sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death." See IPI Criminal 4th No. 7C.06.

Defendant argues that the jury should have been instructed that it could sentence defendant to death only if there were no mitigating *factors* sufficient to preclude imposition of a death sentence. In support

of this argument he cites *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988). He states that in *Mills* the verdict form could be interpreted to require jurors to disregard any mitigating factor that all 12 jurors could not unanimously agree existed. This was unconstitutional because "[i]f eleven jurors agree that there are six mitigating circumstances, the result is that no mitigating circumstance is found. Consequently, there is nothing to weigh against any aggravating circumstance found and the judgment is death even though eleven jurors think the death penalty wholly inappropriate." *Mills*, 486 U.S. at 373-74, 100 L. Ed. 2d at 393, 108 S. Ct. at 1865. In such a case, the result is that the jury "may not give mitigating evidence any effect whatsoever, and must impose the sentence of death." *Mills*, 486 U.S. at 375, 100 L. Ed. 2d at 394, 108 S. Ct. at 1865.

Defendant then goes on to analogize his case with the *Mills* case. He asserts: "His jurors were instructed that they were to vote for death if no 'mitigating factor' was sufficient to preclude death. If all his jurors believed that death was inappropriate because the entirety of his mitigation precluded a death sentence, but none of them believed that any single mitigating factor precluded a death sentence, they were required to sentence him to death. The jury could not give [defendant's] mitigation 'any effect whatsoever' in those circumstances."

In *People v. Ramey*, 152 Ill. 2d 41 (1992), defendant raised basically the same contention as defendant in this case and cited the *Mills* case in support of his argument. In rejecting this argument we said: "In Illinois, unlike Maryland, the belief by one juror that any one mitigating factor sufficient to preclude the death penalty exists is sufficient to do so. As such, Illinois' death penalty procedure clearly provides for meaningful consideration of any and all mitigating factors." *People v. Ramey*, 152 Ill. 2d at 77.

In examining a challenge to jury instructions, a reviewing court must determine whether the instructions, taken as a whole, fairly, fully and comprehensively apprised the jury of the relevant legal principles. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

Here the jury was instructed under IPI Criminal 4th No. 7C.06 to consider "all mitigating factors supported by the evidence," that "[m]itigating factors are reasons why the defendant should not be sentenced to death" and that "[m]itigating factors include *** [a]ny other reason supported by the evidence why the defendant should not be

sentenced to death," even if such reason or mitigating factor "is not one of the specifically listed factors."

It is clear from these instructions that defendant's conclusion in his hypothetical is not correct–the jury was not "required to sentence him to death." On the contrary, the instructions clearly state that *if any one of the jurors* believed that death was inappropriate, based on all of the mitigating evidence, that is, in itself, a "reason supported by the evidence why the defendant should not be sentenced to death." Accordingly, IPI Criminal 4th No. 7C.06 then directs the jury to sign the verdict requiring the court to impose a sentence other than death.

Furthermore, this court has upheld substantially the same language of IPI Criminal 4th Nos. 7C.05 and 7C.06. See, *e.g.*, *People v. Simms*, 192 Ill. 2d 348, 411-15 (2000); *People v. Emerson*, 189 Ill. 2d 436, 503-05 (2000); *Bannister*, 232 Ill. 2d at 81-82.

In *Boyde v Calfornia*, 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990), the Supreme Court held that the proper legal standard for reviewing a claim that an instruction was ambiguous and therefore subject to erroneous interpretation was whether there was a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U.S. at 380, 108 L. Ed. 2d at 329, 110 S. Ct. at 1198. The Supreme Court further said, "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might." *Boyde v. California*, 494 U.S. at 380-81, 108 L. Ed. 2d at 329, 110 S. Ct. at 1198. Accord *People v. Bannister*, 232 Ill. 2d at 81 (correctness of instructions "depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them").

The Supreme Court noted in *Middleton v. McNeil*, 541 U.S, 433, 158 L. Ed. 2d 701, 124 S. Ct. 1830 (2004), that "[n]othing in *Boyde* precludes a state court from assuming that counsel's arguments clarified an ambiguous jury charge." *Middleton v. McNeil*, 541 U.S. at 438, 158 L. Ed. 2d at 708, 124 S. Ct. at 1833. Here, in closing argument, defense counsel apprised the jury, without objection:

> "[The prosecutor] talked about mitigation and aggravation. This is not a balancing test in the sense that you put things on a scale. We don't have to prove mitigation outweighs aggravation. You'll

get the instructions. All we have to do is show you there is a mitigating factor or factors which are sufficient to preclude death."

Defense counsel later reiterated:

"Remember this is not a balancing test. We don't have to prove mitigating factors outweigh aggravating factors; just that there is a single mitigating factor or factors, just one sufficient to preclude that."

The instructions directed the jurors to examine all the mitigating evidence offered by defendant during the hearing in deciding whether there was sufficient mitigation to preclude the imposition of a death sentence. Defense counsel properly argued that the mitigating factors did not have to outweigh the aggravating factors "just that there is a single mitigating factor *** just one" to preclude death. Construing the instructions as a whole, and the record before us, we find that the trial court properly instructed the jury regarding consideration of the mitigation evidence. We further find that there is not a reasonable likelihood that the jurors understood the challenged instructions to preclude proper consideration of all the relevant mitigating evidence and we conclude that the jury understood and properly followed the applicable law in reaching its verdict.

Defendant also tendered a verdict form to the court stating that he could be sentenced to death only if "no mitigating factor or factors" precluded a death sentence and it was rejected by the court. The decision to give a non-IPI rests within the sound discretion of the trial court. *Caffey*, 205 Ill. 2d at 127. Here, the court did not abuse its discretion by refusing to give defendant's proposed verdict form and instead give the verdict forms from IPI Criminal 4th Nos. 7C.08 and 7C.09A, which properly stated the law.

### 9. The State's Remarks at the Sentencing Hearing

Defendant's ninth point for review is that the State improperly argued that defendant should be sentenced to death because he would kill someone if he received life in prison, that the jury should weigh the aggravation against the mitigation and that defendant displayed no remorse for the murder. The State conceded that defendant had said he was sorry, but commented that he "was sorry he was sitting in jail

awaiting his trial." The State then argued, "He didn't show any remorse," and "he shows no remorse." Defendant argues that the State cannot argue that a defendant has shown no remorse when he has. *People v. Gosier*, 145 Ill. 2d 127, 153-54 (1991). Defendant argues that he told the assistant State's Attorney from felony review that he was sorry, that he wanted to do the right thing, and that he would change places with Rose Newburn if it were possible. That was remorse.

The State contends that in *Gosier* this court did not set forth a rule of law regarding commentary on a defendant's lack of remorse, as defendant seems to imply in his brief. Rather, the issue in *Gosier* was whether the prosecutor had made a blatantly untrue statement when he argued that the defendant "had shed no tears for what he had done" considering the fact that the defendant had broken down in tears several times before the jury, and the detective in the case had testified that the defendant had cried during their interview. *Gosier*, 145 Ill. 2d at 153-54.

Here, there was no such incorrect statement of fact. The prosecutor conceded during his remarks that defendant had said that he was sorry, but argued that the apology alone was not enough to show genuine remorse, thereby distinguishing this case from *Gosier*. Further, this court has consistently held that " ' "a convicted defendant's remorse or the absence of it is a proper subject for consideration at sentencing." ' " *Bannister*, 232 Ill. 2d at 91, quoting *People v. Burgess*, 176 Ill. 2d 289, 317 (1997), quoting *Barrow*, 133 Ill. 2d at 281.

Defendant also asserts that the prosecutor improperly argued that defendant should be sentenced to death because he would kill someone if he were to receive life in prison. This court has held "[t]he fact that a defendant is parole-ineligible does not prevent the State from arguing that the defendant poses a future danger, as the State may reasonably argue that defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff." *People v. Mertz*, 218 Ill. 2d 1, 56 (2005).

In *People v. Hudson*, 157 Ill. 2d 401, 457 (1993), this court found that the prosecutor's statement that the defendant "will kill again if he is given the chance" was proper because it was supported by the evidence and based upon testimony regarding prior misconduct. Defendant argues that "the State presented no evidence that [defendant] threatened to kill anyone." We agree with the State that there was testimony, however, that defendant sexually assaulted a young girl while holding an ice pick

to her friend's throat, that he had an actual prior murder in his background, and that he had threatened violent behavior in prison, including possession of a weapon.

Finally, defendant contends that the State improperly argued that death was mandatory if the mitigation did not outweigh the aggravation. Under the Illinois death penalty statute as it existed at the time of the crime, the defendant had to show that there is mitigation "sufficient to preclude imposition of the death penalty." *People v. Olinger*, 112 Ill. 2d 324, 351 (1986).

Defendant's argument fails, however, because the prosecutor's argument was essentially a correct statement of the law. As he noted, the law under which defendant elected to be sentenced did state that "[i]f the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." 720 ILCS 5/9–1(g) (West 2002). In stating that all the jurors had to find was that the "aggravation outweighs the mitigation," the prosecutor was simply rephrasing the standard, to explain that all the jurors had to decide was that the mitigation offered was not justification to preclude the death penalty.

Here, the remarks in question did not substantially prejudice defendant, particularly since there was an overwhelming amount of evidence offered in aggravation, including testimony regarding defendant's 133 disciplinary infractions in the Department of Corrections, his prior murder conviction, and his prior sexual assault.

### 10. Inquiry Into Defendant's Claim of Trial Lawyers'
### Ineffectiveness

Defendant's tenth point for review is that the trial court failed to adequately inquire into defendant's statements that his trial lawyers were ineffective. After denying counsel's motions for a new trial and new sentencing hearing, the court asked defendant if he had anything to say. Defendant said that his attorneys were ineffective for failing to call a law enforcement officer who would have testified on his behalf during the trial and that counsel had selected a biased juror. Asked by the court to comment, defense counsel stated, "We did everything in our power we thought to defend him in this case." The court asked, "Including the examination of any possible witnesses or any possible other avenues that

-43-

could be presented on his behalf?" Counsel replied that he had.

Defendant argues that when a defendant asserts that his trial counsel had been ineffective, he may be entitled to different counsel to investigate those claims. *People v. Johnson*, 159 Ill. 2d 97, 124 (1994). The trial court must conduct an adequate inquiry into allegations of ineffective assistance of counsel, that is, inquiry sufficient to determine the factual basis of the claim. *Johnson*, 159 Ill. 2d at124; *People v. James*, 362 Ill. App. 3d 250, 256 (2005). Here, defendant contends the trial court did not inquire into the factual basis of his claims. The court merely asked counsel whether he believed that the defense had been diligent. He asserts that this court should remand the cause for the appointment of new counsel to investigate defendant's claims that his trial attorneys were ineffective, citing *People v. Krankel*, 102 Ill. 2d 181, 189 (1984).

The State contends the trial court adequately inquired into defendant's claim that his counsel was ineffective and it was not required to appoint new counsel. Defendant's ineffectiveness claims were twofold: (1) that defense counsel had failed to call "a law enforcement officer that could have testified in [his] trial," and (2) that counsel had seated a juror whom he did not want.

The State concedes that this court has held that in some circumstances, new counsel should be appointed to investigate a defendant's claims of ineffectiveness by his trial attorneys. See *People v. Krankel*, 102 Ill. 2d 181 (1984). The law is clear, however, that new counsel is not required in every case, and that the operative concern for a reviewing court is whether the trial court conducted an adequate inquiry into the *pro se* defendant's claim of ineffective assistance. *Johnson*, 159 Ill. 2d at 125. Where the claim lacks merit or pertains to matters of trial strategy, no counsel should be appointed. *People v. Crane*, 145 Ill. 2d 520, 533 (1991).

In this case, the trial court conducted an adequate inquiry and thus rightfully declined to appoint counsel for defendant. Defendant claims that the trial court's entire inquiry into his complaint regarding the witness consisted of the court asking defense counsel whether he examined "any possible witnesses or any possible other avenues that could be presented on his behalf," but this statement fails to take into account that the trial court had been presented with the exact same complaint regarding defendant's trial counsel twice previously. On May 16, 2005, prior to commencement of the trial, defense counsel informed

the court that his client wanted to talk to the court about the same witness. Counsel explained to the court that he talked to his client about it at length and that counsel did not believe the witness should be called.

On the next court date, the issue was addressed again by the court via a motion to withdraw filed by defense counsel. Counsel explained to the court that defendant's family had located a potential witness, specifically, a state trooper who had stopped defendant on two occasions, but that counsel did not want to call the trooper as a witness, and that he considered the potential testimony aggravation. The trial court talked to defendant regarding the witness and explained to him that he had "four competent attorneys" and told defendant that he needed to realize that they were not calling the witness because "in their expert opinion, it would do more harm than good."

These two exchanges between defendant and the court explain why the trial court's inquiry on September 19, 2006, did not need to be lengthy. The court was already familiar with the substance of defendant's complaint regarding his counsel since it was presented on the two prior occasions. As such, the inquiry conducted by the trial court was sufficient to satisfy the requirement set forth in *Johnson*. It is well established that decisions concerning whether to call certain witnesses for the defense are matters of trial strategy left to the discretion of trial counsel. *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

Defendant's other complaint revolved around counsel's decision to seat a juror whom defendant believed to be biased. The law is equally clear that defense counsel's conduct during *voir dire* involves matters of trial strategy that generally are not subject to scrutiny under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). See also *People v. Metcalfe*, 202 Ill. 2d 544, 561-62 (2002). Here, both of defendant's complaints fell under the parameters of trial strategy and therefore the trial court did not err in choosing not to appoint counsel.


11. Death Penalty Statute

Defendant's eleventh point for review is that the Illinois death penalty statute violates due process under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because the State is not required to prove beyond a reasonable doubt that aggravating factors outweigh the mitigating factors. Defendant notes that he chose to be

sentenced under the old statutory scheme in effect at the time of the crime, which required the jury to sentence him to death if it found no mitigation sufficient to preclude a death sentence. 720 ILCS 5/9–1(g) (West 2000). He argues that this court's rejection of an *Apprendi* challenge to the constitutionality of our death penalty statute should be reconsidered.

The State contends that the Illinois death penalty statute does not violate the principles announced in *Apprendi* and *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), because the statute does not require the State, at the second stage of the death sentencing hearing, to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors. We agree. This court has repeatedly rejected defendant's argument. See, *e.g.*, *Bannister*, 232 Ill. 2d 52; *Harris*, 225 Ill. 2d at 50; *People v. Thompson*, 222 Ill. 2d 1, 52-54 (2006); *Mertz*, 218 Ill. 2d at 93-94; *People v. Ballard*, 206 Ill. 2d 151 (2002); *People v. Davis*, 205 Ill. 2d 349 (2002). We decline to reconsider these decisions.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 14, 2010, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2008). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*