NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 180758-U

NO. 4-18-0758

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 26, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| TOMMY L. JOHNSON, | ) | No. 17CF1648 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court remanded for a preliminary *Krankel* inquiry based on
        defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 2    In November 2017, the State charged defendant, Tommy L. Johnson, with

domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and criminal damage to property (720

ILCS 5/21-1(a)(1) (West 2016)), where defendant knowingly (1) caused bodily harm to his

ex-girlfriend, Jennifer M., when he punched her in the face and (2) caused damage exceeding

$500 to her vehicle. Following a July 2018 trial, a jury found defendant guilty of domestic

battery. In August 2018, defendant filed a motion for a new trial. The trial court denied the

motion. The court sentenced defendant to six years' imprisonment.

¶ 3    Defendant appeals, arguing (1) his trial counsel provided ineffective assistance of

counsel by failing to impeach Jennifer with her prior inconsistent testimony about the timing of

the alleged acts of domestic violence and (2) the trial court failed to conduct an adequate inquiry into his *pro se* claims of ineffective assistance of trial counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). The State concedes the last issue. We accept the State's concession and remand for an inquiry into defendant's *pro se* claims of ineffective assistance of counsel.

¶ 4                                    I. BACKGROUND

¶ 5           In November 2017, the State charged defendant with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2016)), where defendant knowingly (1) caused bodily harm to Jennifer when he punched her in the face and (2) caused damage exceeding $500 to her vehicle. Following a February 2018 trial, a jury acquitted defendant of criminal damage to property, but the trial court declared a mistrial on the domestic battery charge where the jury was unable to reach a verdict on that charge. Following a May 2018 jury trial, the trial court declared a mistrial on the domestic battery charge where the jury was once again unable to reach a verdict on that charge.

¶ 6                       A. Defendant's July 2018 Jury Trial

¶ 7           Below, we summarize the relevant testimony elicited during defendant's July 2018 jury trial.

¶ 8                                    1. *Jennifer M.*

¶ 9           Jennifer testified she and defendant were in a romantic relationship between 2005 and 2008 and had two children together. On November 21, 2017, Jennifer moved into a new apartment on Ludlow Street in Rantoul, Illinois. On November 22, 2017, Jennifer left the apartment to drive to the gas station when she ran into defendant outside her apartment. Jennifer observed defendant with a red cast on his right hand. Jennifer testified defendant took her car

keys out of her hand and money out of her bra. Jennifer also witnessed defendant take six to seven blue pills, which defendant told her was Xanax. Defendant then walked toward Jennifer's vehicle and said, "Let's go." Over defense counsel's objection, Jennifer stated she obeyed defendant and got into her vehicle with him, "[b]ecause I knew if I didn't, I would have got drug to the car."

¶ 10    Once inside the vehicle, defendant drove to a residence where Jennifer used to live. Jennifer testified defendant "became like incoherent[,]" so she asked him to let her drive. Jennifer got out of the vehicle and as she walked around the back of the vehicle, defendant backed up and hit her with the vehicle. Jennifer then went around and got back in the passenger seat of the vehicle and defendant drove to a Walgreens. Once at the Walgreens, defendant went inside the store and Jennifer stayed inside the vehicle. After defendant returned to the vehicle, he drove them to a house on Fredrick Street where defendant got out of the vehicle and went up to a house. At that point, Jennifer took the opportunity to jump into the driver's seat and drove away. When asked if anything else happened between defendant and Jennifer while they were in the vehicle together, Jennifer responded, "I—I mean, I don't recall. I have no—I can't remember, I mean."

¶ 11    Jennifer then drove to Andrea Strong's residence on Eater Drive in Rantoul. Jennifer asked Strong, defendant's aunt, for gas money and a ride to her apartment to retrieve her cellular telephone. After Strong finished cooking, Strong and Jennifer got into Strong's minivan, and Strong drove Jennifer to her apartment on Ludlow. Jennifer testified that as she walked to the front door of her apartment, she saw defendant coming toward her. At that point, Jennifer ran back to the minivan. When Jennifer got back into the minivan, she attempted to lock the passenger door but instead accidently rolled down the window. Defendant then reached in the

window and started beating Jennifer in the face and head with his casted arm while holding her by the hair with his other hand. Subsequently, Strong, who was still in the driver's seat, drove them back to her residence.

¶ 12　　　　Once back at Strong's residence, Strong and Jennifer went inside. Jennifer observed she had a broken nose and it was bleeding. Jennifer also had cast burns and scars on the side of her face and permanent dark circles under her eyes. Jennifer testified Strong called the police. When the police arrived, Jennifer declined medical treatment. Jennifer never received a medical diagnosis for a broken nose. On cross-examination, Jennifer testified she and Strong drove to a nearby liquor store at the direction of police officers. Jennifer identified photographs of her injuries.

¶ 13　　　　Jennifer also testified about two prior incidents involving defendant. The trial court informed the jury it could consider the other incidents as propensity evidence.

¶ 14　　　　On July 31, 2017, Jennifer told defendant he could not borrow her vehicle, and in response, he threatened to break the windows in her vehicle. On that same day, while Jennifer worked at America's Best Value Inn, someone broke the front window of her vehicle. Jennifer testified defendant later admitted he broke the window and paid for the repairs.

¶ 15　　　　On September 14, 2017, Jennifer worked at America's Best Value Inn from 3 p.m. to 11 p.m. During her shift, Jennifer began to walk outside to smoke and saw defendant. Jennifer testified the next thing she knew defendant was helping her off the ground after she had been knocked unconscious. Jennifer also alleged defendant broke the window out of her vehicle the day before. While Jennifer did not observe defendant break the window, he had previously threatened to do so.

¶ 16　　　　　　　　　　　　2. *Andrea Strong*

¶ 17 Andrea Strong testified that in November 2017 she lived at 1517 Eater Drive with her children and husband. On November 22, 2017, Strong was in her home cooking the next day's Thanksgiving meal when Jennifer came over. After Strong finished cooking, she drove her minivan, with Jennifer as a passenger, to a nearby gas station to fill up a gas can for Jennifer and then drove to Jennifer's residence. Once at Jennifer's residence, Strong stayed in her minivan and looked at her cellular telephone while Jennifer got out and walked toward her apartment. Strong looked up and observed Jennifer running back toward the minivan with defendant following her. Jennifer got into the minivan, closed the door, and accidently opened the window while trying to lock the door. Strong testified defendant never reached into the vehicle to hit Jennifer because she drove away when Jennifer jumped back into the minivan. Strong then dropped Jennifer off at her vehicle with the gas can and went to Bud's Bar to play the slots.

¶ 18 Strong testified she spoke with police at her residence but she denied telling the police that defendant reached into the window and hit Jennifer. Strong had a prior felony conviction for unlawful delivery of a controlled substance.

¶ 19 3. *Officer Jerry King*

¶ 20 Jerry King, a Rantoul police officer, testified that on November 22, 2017, around 8:45 p.m., he observed defendant and Jennifer at a Walgreens. An hour later, Officer King responded to 1517 Eater Drive for a domestic incident. Upon arrival at 1517 Eater Drive, Officer King observed Jennifer standing outside the residence. Officer King spoke with Jennifer about what happened, and Officer King developed defendant as the suspect. Officer King observed Jennifer bleeding from the nose, she exhibited bruises on her face, and she had blood on her shirt. Officer King testified pictures taken of Jennifer from that night displayed her

injuries. Officer King also reiterated Jennifer declined medical treatment. When Officer King spoke with Jennifer, his body camera was on and operating.

¶ 21 Officer King also spoke with Strong. When Officer King spoke with Strong, his body camera was also on and operating. The State played portions of the body camera video footage for the jury. On the video recording, Strong said she and Jennifer were about to drive away from Jennifer's apartment when defendant reached in the window of her minivan and hit Jennifer.

¶ 22 4. *Officer Kyle Donovan*

¶ 23 Kyle Donovan, a Rantoul police officer, testified that on November 22, 2017, he responded to a call at 1517 Eater Drive. While driving toward 1517 Eater Drive, Officer Donovan spotted defendant walking down Grove Street, a few blocks between Eater Drive and Ludlow Street. Officer Donovan observed defendant with a red cast on his right arm. Officer Donovan testified that when he stopped to talk to him, defendant's "speech was a bit mumbled, spoke very fast, a lot of unintelligible comments." Defendant indicated to Officer Donovan he was looking for Jennifer because "she had inquired about purchasing some heroin from him earlier that evening."

¶ 24 5. *Defendant*

¶ 25 Defendant testified he and Jennifer were in an on-and-off-again romantic relationship and had two children together. On November 21, 2017, defendant and Jennifer moved into an apartment on Ludlow Street with their children. In the early morning hours of November 22, 2017, defendant took a prescription pill to help him sleep after recently having oral surgery and a broken hand. Defendant also testified he and Jennifer slept together. Around 9 a.m. on November 22, 2017, defendant woke up to Jennifer angry with him because he spilled

her heroin around 4 a.m. that morning as he tried to straighten up the room. Defendant and Jennifer then spent the afternoon driving around—with their children—trying to borrow money to replace the heroin. The couple arrived back at the apartment around 5 p.m.

¶ 26 Around 7 p.m., defendant and Jennifer left the apartment and drove to a Walgreens. Defendant testified that while they drove to Walgreens, they argued over his pain medication. Defendant stated Jennifer was "screaming, yelling, just being very mean." Once at Walgreens, defendant went inside and Jennifer stayed in the vehicle.

¶ 27 After they left Walgreens, defendant drove to an area where the couple used to live. According to defendant, he drove to that area because he saw police in his rearview mirror as he drove and did not want to get pulled over for arguing with Jennifer. Next, he drove to a gas station so Jennifer could use the restroom. At the gas station, Jennifer hit defendant two times. Jennifer also hit defendant as he drove. Defendant told Jennifer to stop hitting him because the police were nearby. Defendant testified Jennifer then turned the diamond ring on her finger around and hit herself in the face and banged her head on the dashboard.

¶ 28 Defendant then drove to Jennifer's aunt's residence to find his children. Once at Jennifer's aunt's house, defendant exited the vehicle. After defendant exited the vehicle, Jennifer drove away. Defendant then walked to the apartment on Ludlow Street. Later, while outside the apartment on Ludlow Street, defendant observed Strong drive up to the apartment in her minivan with Jennifer. Defendant approached the minivan and asked Jennifer for his cellular telephone. Jennifer declined to give defendant his cellular telephone and the minivan drove away. Defendant denied he hit Jennifer.

¶ 29 Defendant then walked to Strong's residence at 1517 Eater Drive to talk to his uncle about the situation. Once defendant walked into Strong's house, he observed "[Jennifer]

playing with her nose making blood fingerprints smudges on her shirt." Defendant's uncle then came out of his room and asked defendant to leave. Defendant then walked to a nearby liquor store. While at the liquor store, defendant observed Jennifer and his grandmother pull up to the store. Defendant walked away.

¶ 30    Defendant denied hitting Jennifer or damaging her vehicle. Defendant testified that after the July 31, 2017, incident with Jennifer's vehicle, he offered to pay to fix Jennifer's broken window because he did not want his children riding around in a vehicle with a broken window.

¶ 31    6. *Jury Verdict*

¶ 32    At the close of trial, the jury found defendant guilty of domestic battery.

¶ 33    B. Sentence and Posttrial Motions

¶ 34    In August 2018, defendant filed a motion for a new trial. In the motion, defendant argued the trial court erred in overruling defendant's objections to Jennifer testifying regarding prior allegations. At the August 27, 2018, sentencing hearing, the trial court denied the motion. The case then proceeded to sentencing. In aggravation, the State presented three witnesses who testified to other domestic violence incidents between defendant and Jennifer. Joel Sanders, a lieutenant with the Urbana Police Department, testified to a September 14, 2006, domestic violence incident between defendant and Jennifer. Jim Kerner, a detective with the Urbana Police Department, testified to a July 29, 2008, domestic violence incident between defendant and Jennifer. Jennifer testified to both the 2006 and 2008 incidents involving defendant. Jennifer also described how the November 2017 incident affected her sense of safety and well-being.

¶ 35    In mitigation, defendant presented two witnesses.  Mary Jones, defendant's aunt, testified to defendant's character.  She described defendant as caring, laid-back, and focused on his children.  Billie Pollie, defendant's grandmother, also testified to defendant's character.  She described defendant as a "lovely young man" and someone who helped care for his family.

¶ 36    Defendant made a statement in allocution in which he maintained his innocence and made several complaints about his counsel's performance at trial.  Amanda Riess and Morgan Farrington represented defendant at his July 2018 trial.  Regarding his trial counsel's performance, defendant stated,

> "I had asked Amanda Riess to present my cast, and she didn't.  I asked questions—I mean, I had asked Amanda Riess to ask questions to prove that I'm innocent.  She didn't.  I asked Amanda Riess to cross-examine me and Jennifer in the third trial.  She didn't.  I asked Amanda Riess to obtain video footage of Casey gas station that showed that Jennifer being attacked, and she didn't.  I asked Amanda Riess to pick up [*sic*] certain jurors.  She didn't.  I asked Amanda Riess to file charges perjury; she didn't.
>
> Anyway, Ms. Farrington was not in my first and second trial.  She is unexperienced.  Once Jennifer became hostile, Ms. Farrington stopped the cross-examine.  I asked why.  Ms. Farrington respond, 'The witness being hostile, so I had to stop.'  Your honor, that's not representing me to the best of her ability.
>
> Each time Amanda Riess wrote me, she—what she say?  She told me that I was gonna be found guilty.  I am innocent.  And

my freedom is on the line. And my defense and Public Defender failed to prove my [*sic*] innocent by not representing me to the best of their ability because I would not take a plea bargain.

I am innocent. I was not allowed to fully testify in my third trial like I testify in my first and second trial with Amanda Riess due to the change of Public Defenders cross-examine me. Ms. Farrington was nervous, and my cross-examine was short-lived.

I asked Ms. Farrington response. At least she got Jennifer to admit what street I got out of her car on. I didn't see that view Ms. Farrington made since Ms. Farrington didn't make a strong point with that information in front of this new set of jurors. I didn't have a fair trial. My defense counsel refused to represent me to the best of their ability."

¶ 37    The trial court took into consideration defendant's presentence investigation report, the evidence in aggravation and mitigation, and defendant's statement in allocution. Regarding defense counsel's performance, the court stated,

"The Defendant has indicated in his right of allocution concerns about his representation.

Given the circumstances surrounding the offense, the evidence that was presented, it is absolutely amazing that the Public Defender's Office was able to get two mistrials. They did a remarkable job representing the [d]efendant, given the overwhelming evidence in this case."

- 10 -

Ultimately, the court sentenced defendant to six years' imprisonment, to run consecutive to Champaign County case No. 18-CF-338.

¶ 38    In September 2018, defendant filed a motion to reconsider his sentence. After a November 2018 hearing, the trial court denied the motion.

¶ 39    This appeal followed.

¶ 40                    II. ANALYSIS

¶ 41    On appeal, defendant argues (1) his trial counsel provided ineffective assistance of counsel by failing to impeach Jennifer with her prior inconsistent testimony about the timing of the alleged acts of domestic violence and (2) the trial court failed to conduct an adequate inquiry into his *pro se* claims of ineffective assistance of trial counsel pursuant to *Krankel*. The State concedes the last issue. We remand for *Krankel* proceedings.

¶ 42    When a defendant makes a posttrial claim of ineffective assistance of counsel, the trial court must follow the common-law procedure in *Krankel*. *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732. "The trial court must conduct an adequate inquiry into allegations of ineffective assistance of counsel, that is, inquiry sufficient to determine the factual basis of the claim." *People v. Banks*, 237 Ill. 2d 154, 213, 934 N.E.2d 435, 468 (2010). "In making the inquiry, 'some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim.' " *Ayres*, 2017 IL 120071, ¶ 12 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 30, 25 N.E.3d 1127). "Likewise, the court is permitted to discuss the allegations with defendant." *Id.* "Lastly, the trial court is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Id.* The goal of a

- 11 -

*Krankel* proceeding is to have the trial court fully consider "a defendant's *pro se* claim and thereby potentially limit issues on appeal." *Id.* ¶ 13.

¶ 43 To trigger the court's obligation to conduct a *Krankel* inquiry, all a defendant needs to do is make the bare allegation he received ineffective assistance of counsel. *Id.* ¶¶ 18, 21, 23 (finding the simple assertion "I received ineffective assistance of counsel" should not be ignored by the trial court). This may be accomplished orally or in a written motion. *Id.* ¶ 24. While *pro se* motions should generally be stricken when a defendant is represented by counsel, an exception exists when the motion challenges counsel's performance. *People v. Rhodes*, 2019 IL App (4th) 160917, ¶ 18, 128 N.E.3d 1100. We review *de novo* whether the trial court properly conducted a preliminary *Krankel* inquiry. *Jolly*, 2014 IL 117142, ¶ 28.

¶ 44 When defendant gave a statement in allocution, he orally alleged his counsel was ineffective and "refused to represent [him] to the best of their ability." Defendant's assertions he was denied the effective assistance of counsel triggered the trial court's obligation to conduct a *Krankel* inquiry. While the trial court acknowledged defendant expressed concerns with his trial counsel in his statement of allocution, the court failed to conduct an inquiry into the underlying factual basis, if any, of defendant's *pro se* ineffective assistance claims. Rather, the court simply stated, "[Counsel] did a remarkable job representing the [d]efendant, given the overwhelming evidence in the case." The State concedes the court erred by not conducting a *Krankel* inquiry into defendant's claims. We accept the State's concession.

¶ 45 Because we conclude a *Krankel* inquiry is required, we need not consider defendant's other argument on appeal at this time. *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37, 100 N.E.3d 177 ("Depending on the results of the *** *Krankel* inquiry, defendant's other claims may become moot."). While we remand "for further proceedings on defendant's *pro se*

- 12 -

claim of ineffective assistance of counsel," we retain jurisdiction over defendant's remaining claim. *People v. Wilson*, 2019 IL App (4th) 180214, ¶ 26, 137 N.E.3d 868. If "defendant is not satisfied with the outcome of the proceedings on remand, he may again appeal and raise any supplementary claims relating to the remand proceedings, and the State may have an opportunity to respond to those claims." *Id.*

¶ 46                                    III. CONCLUSION

¶ 47           For the reasons stated, we remand for the trial court to conduct a preliminary *Krankel* inquiry into defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 48           Remanded with directions.